**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**XIAOYI RAYMOND GAO, Ph.D.**
2343 Kensington Drive
Columbus, Ohio 43221,

        Plaintiff,

    v.

**THE OHIO STATE UNIVERSITY**
c/o Andy Wilson, Ohio Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215

    and

**SAYOKO MOROI, M.D., Ph.D.**
Chair of the Department of Ophthalmology
and Visual Sciences
c/o The Ohio State University
915 Olentangy River Road
Columbus, Ohio 43212

        Defendants.

CASE NO.

JUDGE

MAGISTRATE JUDGE

JURY DEMAND ENDORSED HEREON

**VERIFIED COMPLAINT**

Plaintiff Xiaoyi Raymond Gao, Ph.D., for his Verified Complaint against Defendants The Ohio State University and Sayoko Moroi, M.D., Ph.D., hereby states as follows:

**PARTIES**

1.      Plaintiff Xiaoyi Raymond Gao, Ph.D. (hereinafter "Plaintiff" or "Dr. Gao") is an Asian male of Chinese national origin, over the age of 40, who resides in the City of Columbus in Franklin County, Ohio.

2.      At all times relevant herein, Defendant The Ohio State University (hereinafter "Defendant" or "the University") was an entity of the State of Ohio.

3. At all times relevant herein, Defendant Sayoko Moroi, M.D., Ph.D. (hereinafter referred to as Defendant "Dr. Moroi") is a resident of the State of Ohio, duly licensed to practice medicine in the State of Ohio, specifically with a primary place of business located in Franklin County, Ohio. Defendant Dr. Moroi is the Chair of the Department of Ophthalmology and Visual Sciences at The Ohio State University, and Plaintiff's claims are brought against her in her individual capacity.

## JURISDICTION AND VENUE

4. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. (hereinafter "Title VII"), 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

5. Subject-matter jurisdiction over this action is conferred pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States giving it the Court federal question jurisdiction.

6. Venue is proper in the United States District Court for the Southern District of Ohio, Eastern Division, because the Plaintiff was employed by The Ohio State University in Columbus, located in Franklin County, Ohio. Venue is further proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of Ohio.

7. Plaintiff Dr. Gao has complied with all jurisdictional prerequisites to the filing of this lawsuit, and this Complaint is filed within ninety (90) days of Plaintiff's receipt of his Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC") in connection with EEOC Charge No. 22A-2025-02316 on March 30, 2026, which is attached as Exhibit 1.

Plaintiff received a Right to Sue letter in connection with EEOC Charge No. 532-2026-02987 on June 15, 2026, which is attached as Exhibit 2.

### FACTS RELEVANT TO ALL CLAIMS

**Parties and Background**

8.      Plaintiff Xiaoyi Raymond Gao, Ph.D. ("Plaintiff" or "Dr. Gao") is an Asian individual of Chinese national origin, born in the People's Republic of China. Dr. Gao is a tenured Associate Professor employed by The Ohio State University in the Department of Ophthalmology and Visual Sciences.

9.      Plaintiff Dr. Gao began his employment with The Ohio State University on January 1, 2019, pursuant to an offer letter dated November 20, 2018 ("Offer Letter"), which set forth the terms and conditions of his employment and the resources committed to support his research program. A true and accurate copy of the Offer Letter is attached as Exhibit 3.

10.      Defendant The Ohio State University, acting through its Department of Ophthalmology and Visual Sciences (the "Department"), is Dr. Gao's employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq.

11.      At all times relevant to this Complaint, Defendant Dr. Moroi has served as the Chair of the Department of Ophthalmology and Visual Sciences. As Department Chair, Defendant Dr. Moroi controlled or substantially influenced Dr. Gao's research resources, personnel support, office and laboratory space, annual reviews, merit salary treatment, grant support, and professional visibility.

12.      Dr. Gao's Offer Letter expressly promised, among other things, approximately $1,500,000 in startup funds, a dedicated genetic counselor, dedicated research staff, laboratory

3

space, and the ability to implement a biobank in support of his research program. The Offer Letter contained no expiration date on the startup funds.

13. On April 17, 2020, following a conference call held the prior day with Defendant Dr. Moroi and the Chief Scientific Officer, Dr. Peter Mohler, Dr. Gao sent a written confirmation email to Dr. Moroi and Dr. Mohler memorializing the parties' agreement, which expressly stated, "My start-up fund, 1.5M, does not have an expiration date." The email invited correction, however, neither Dr. Mohler nor Dr. Moroi contested or corrected any point in the email at that time.

14. Dr. Gao is a highly qualified genetic and bioinformatics researcher whose publication record from 2022-2023 alone includes multiple peer-reviewed articles in Nature Communications, HGG Advances, Scientific Reports, Alzheimer's & Dementia, BMC Bioinformatics, and Frontiers in Genetics, exceeding the productivity of comparable same-rank faculty in the Department.

**Discriminatory Conduct Beginning June 2022**

15. Beginning in or around 2020 and escalating from June 2022 forward, Defendant Dr. Moroi engaged in a continuing pattern of treating Dr. Gao less favorably than similarly situated, non-Chinese faculty members with respect to office space, laboratory space, personnel support, grant resources, performance reviews, compensation, and professional visibility.

16. Defendant Dr. Moroi repeatedly criticized Dr. Gao as a non-native English speaker, telling him on multiple occasions, "Raymond, you have English language problems," particularly in contexts where Dr. Moroi was denying him access to personnel hired using his startup package.

17. Defendant Dr. Moroi also repeatedly criticized Dr. Gao for expressing his professional scientific opinions, in contexts in which Dr. Moroi did not similarly criticize non-Chinese faculty for expressing comparable opinions.

18.     Over time, under Dr. Moroi's repeated criticism of both his English-language proficiency and his expression of professional opinions, Dr. Gao was left with no choice but to remain silent. Dr. Gao's silence, however, did not abate the adverse treatment; instead, during the ensuing period, Dr. Gao was progressively deprived of research funds, research resources, personnel support, office space, laboratory space, timely and accurate annual performance reviews, merit-based salary increases, institutional grant-application support, and other professional opportunities.

19.     On January 20, 2022, during a Zoom meeting attended by Dr. Gao's lab member Marion Chiariglione, genetic counselor Kara Williams, and Dr. Moroi's staff scientist David Reed, Defendant Dr. Moroi publicly labeled Dr. Gao as "junior" while referring to another associate professor of identical rank, Dr. Mohamed Abdel-Rahman, an Egyptian-American faculty member, as "senior." Dr. Moroi made dismissive comments to Dr. Gao on multiple occasions, including "Raymond, you are still young," while not making comparable comments to non-Chinese faculty.

**Office Space Disparity**

20.     In January 2021, Defendant Dr. Moroi took Dr. Gao's office, Wiseman 225, and assigned it to her new hire, an Indian, non-Chinese faculty member (an associate professor of the same rank).

21.     In or around October 2023, Dr. Gao was assigned Suite 4061, a desirable corner office with windows on two sides, per an October 6, 2023 email from Elvia Suli, Principal Project Manager for Space Assignment at The Ohio State University College of Medicine.

22.     On October 12, 2023, Defendant Dr. Moroi sent an internal email inquiring, "Is 4061 still the nice corner room with windows on two sides? This is for Dr. Gao?" Shortly

5

thereafter, Suite 4061 was reassigned to Dr. Timothy Lucas, a Caucasian, non-Chinese faculty member.

23. Dr. Gao was relocated to Suite 4121, a smaller office situated adjacent to the restrooms in a high-traffic, high-noise area. Defendant Dr. Moroi has not reassigned any similarly situated, non-Chinese faculty members to less desirable office locations. This was the second time Dr. Moroi had reassigned a more desirable office occupied by Dr. Gao to a younger, non-Chinese colleague.

**Laboratory Space Disparity**

24. During the 2023-2024 period, Dr. Gao was allocated only two laboratory seats for a research team of three members, severely restricting his team's workflow and causing frequent absences, illness, and recruitment difficulties. Dr. Gao's lab members were denied even temporary use of empty seats in the laboratory.

25. By contrast, during the same period, similarly situated or more junior, non-Chinese faculty received materially greater laboratory resources from Dr. Moroi: Dr. Mendel, a Caucasian, non-Chinese assistant professor, received eight lab seats; Dr. Kerur, an Indian, non-Chinese associate professor, received a large lab capable of hosting more than four members plus four additional seats; and Dr. Tamiya, a Japanese, non-Chinese associate professor, received a similarly large lab plus four additional seats.

26. Dr. Gao communicated the impact of these inadequate accommodations to Elvia Suli, Principal Project Manager for Space Assignment at the College of Medicine, on December 6, 2023, to Human Resources personnel Colleen Rupp and Kelsey Hines on December 6, 2023, and to Kelsey Hines on September 27, 2023. No adjustments were made to Dr. Gao's inadequate lab space to provide for workspace for Dr. Gao's lab members.

27.    In or around October 2023, when faculty in the Department of Ophthalmology and Visual Sciences relocated from the Wiseman Hall facility to the Pelotonia Research Center ("PRC"), similarly situated, non-Chinese faculty members were provided adequate laboratory space at the PRC for their research operations and equipment. Dr. Gao was not provided space at the PRC for his laboratory equipment. Dr. Moroi communicated to Dr. Gao that she would cover the cost of moving Dr. Gao's laboratory equipment if Dr. Gao relocated the equipment to his personal residence rather than to the PRC.

**Protected Activity in 2022**

28.    On June 9, 2022, Dr. Gao attended a Diversity, Equity, and Inclusion ("DEI") seminar conducted at the Department of Ophthalmology and Visual Sciences by Ms. Sophia Antoun, a University-level DEI officer and the seminar instructor, addressing the themes, examples, and messages of discrimination based on race, gender, and sexual orientation. Several of the discriminatory patterns Ms. Antoun described during the seminar closely mirrored experiences Dr. Gao had encountered as a Chinese-American faculty member in the Department of Ophthalmology and Visual Sciences.

29.    During and at the conclusion of the June 9, 2022 seminar, Dr. Gao reported to Ms. Antoun his own experiences of discrimination, specifically, that he had been repeatedly criticized in a manner that made him feel unable to freely express his professional opinions, and that he had been criticized for his English-language proficiency — experiences he identified at the time as differential treatment based on his race and national origin. Dr. Gao then requested Ms. Antoun's contact information in order to continue the conversation.

30.    Upon learning of Dr. Gao's report at the seminar, Dr. Gloria Fleming, the Department of Ophthalmology and Visual Sciences' DEI Officer, invited Dr. Gao to a confidential

7

conversation on or about June 9-10, 2022, during which Dr. Gao again reported the same race and national-origin-based discriminatory treatment. Dr. Fleming subsequently referred Dr. Gao to Dr. Dana McTigue, the Vice Chair for Diversity, Equity, and Inclusion of the College of Medicine, recommending that Dr. Gao escalate his report to the College level.

31. In June and July 2022, pursuant to Dr. Fleming's referral, Dr. Gao escalated his complaints to Dr. McTigue, the College of Medicine's Vice Chair for Diversity, Equity, and Inclusion. Later, Dr. McTigue added Dr. Loren Wold, Associate Dean of Research Compliance at the College of Medicine, to the conversation. On July 8, 2022, after meetings with Dr. McTigue and Dr. Wold, Dr. Gao was referred back to his Department to discuss the issues he had raised with Vice Chair for Research, Dr. Colleen Cebulla. Dr. Gao's meeting with Dr. Cebulla was scheduled for July 28, 2022.

**Retaliation Immediately Following Protected Activity**

32. Defendant Dr. Moroi became aware of Dr. Gao's complaints and protected activity by no later than July 2022.

33. On July 8, 2022, shortly after Dr. Gao's DEI reports, Defendant Dr. Moroi ignored Dr. Gao's request to sequence and genotype collected genetic samples — samples essential to Dr. Gao's relevant research.

34. In early August 2022, shortly after Dr. Gao's scheduled July 28, 2022 meeting with Dr. Cebulla, Defendant Dr. Moroi pressured Dr. Gao to sign a Memorandum of Understanding ("MOU") purporting to modify the Offer Letter by removing the dedicated genetic counselor support promised in the Offer Letter. Dr. Gao refused to sign the MOU.

35. On August 15, 2022, during a Zoom meeting with Department administrator, Bob LaFollette, and Vice Chair for Research, Dr. Colleen Cebulla, Dr. Gao was told that a new offer

8

letter eliminating the genetic counselor and other startup resources would be issued "no matter whether [he] agreed or not" and that the change was "legalized." Dr. Gao again refused to consent.

36. On September 6, 2022, during a Zoom meeting called in response to Dr. Gao's complaints of discrimination, Dr. Wold dismissed Dr. Gao's concerns by stating, "We are all adults. Don't be childish." This remark was made in the presence of Dr. McTigue and Dr. Cebulla. Dr. Gao left the meeting silent and intimidated, fearing further retaliation.

**Unilateral Execution of the 2023 MOU**

37. In or around January or February 2023, approximately six months after Dr. Gao's protected activity and refusal to consent to the August 2022 MOU, Defendant Dr. Moroi unilaterally executed an MOU (the "2023 MOU") that: (a) imposed an expiration date of FY19-FY25 on Dr. Gao's $1,500,000 startup funds; (b) removed the promised genetic counselor and research staff; and (c) granted the Chair veto authority over Dr. Gao's use of his own authorized funds.

38. Dr. Gao did not sign the 2023 MOU. He was not shown the 2023 MOU. He was not given notice of the 2023 MOU when it was signed by Defendant Dr. Moroi.

39. Dr. Gao first learned of the existence of the 2023 MOU on December 31, 2025, nearly three years after it was executed, when he obtained it through records filed in the Ohio Civil Rights Commission ("OCRC") proceeding.

40. The 2023 MOU directly contradicted the express written ratification of Dr. Gao's startup terms by Dr. Moroi and Dr. Mohler in April 2020 and materially altered the terms, conditions, and privileges of Dr. Gao's employment.

**Obstruction of Research Activities**

41. Throughout 2022, Defendant Dr. Moroi obstructed Dr. Gao's Glaucoma Genetics Study IRB protocol. Departmental approval was ultimately conditioned on the removal of the

sample-collection component of the protocol. Dr. Gao was forced to submit the stripped-down protocol on October 25, 2022, by which time the genetic counselor assigned to the project had initiated her departure.

42. Throughout 2022, Defendant Dr. Moroi blocked the submission of Dr. Gao's separate RNA-seq Analysis of Ocular Tissues IRB protocol without explanation.

43. Throughout 2022, Defendant Dr. Moroi prevented Dr. Gao from implementing the biobank expressly promised in his Offer Letter, while simultaneously establishing her own biobanking infrastructure for her own research projects.

44. As a direct consequence of Dr. Moroi's obstruction of sample collection and biobanking, 86% of the DNA collection kits purchased using Dr. Gao's startup funds expired unused.

**Denial of Annual Reviews, Salary Increases, and Grant Support**

45. Defendant Dr. Moroi failed to conduct annual performance reviews of Dr. Gao for the 2021-2022 and 2022-2023 rating periods, in violation of University policy requiring annual reviews to be completed before July 1 of each year. Dr. Gao received no merit salary increases for those years. Dr. Gao recalls receiving only one merit salary increase during his six-plus years of employment with the University.

46. During the same period, similarly situated, non-Chinese faculty members (including Dr. Kerur, an Indian associate professor) received timely annual reviews and annual merit salary increases of 3.5 percent or higher each year from 2021 forward.

47. From January 2019 through August 2023, Dr. Gao supported approximately 50 to 88.6 percent of his own salary through external competitive grant funding, a level of self-support substantially higher than many of his peers.

10

48.     Throughout 2021 and 2022, Defendant Dr. Moroi directed Dr. Gao on multiple occasions to cover the salaries of Dr. Moroi's own staff members from Dr. Gao's NIH R01 research grant funding. For example, Dr. Gao was required to cover approximately 25 percent of the salary of Dr. Moroi's staff member, David Reed, from Dr. Gao's NIH R01 grant in 2021 and 2022. These directives caused Dr. Gao's competitively obtained federal research grant resources to subsidize the personnel costs of Dr. Moroi's research operations rather than supporting Dr. Gao's own research program.

49.     In April 2023, Defendant Dr. Moroi informed Dr. Gao that the content of his Lead-PI R01 grant proposal, "Genetic Risk Score of Intraocular Pressure for Glaucoma Risk Stratification," would be repurposed for a sole-PI submission by Dr. Moroi, thereby denying Dr. Gao the opportunity to submit the R01 under his own leadership.

50.     In January 2024, Defendant Dr. Moroi provided a Letter of Support for Dr. Gao's RPB grant application but simultaneously refused to provide a support letter for Dr. Gao's R01 application on the same research subject, materially impairing his ability to submit the RO1.

51.     In October 2024, Defendant Dr. Moroi deliberately delayed signing off on grant applications until past their submission deadlines, obstructing Dr. Gao's grant submissions.

**Intellectual Property Appropriation**

52.     In or around 2020, shortly after assuming her Chair position, Defendant Dr. Moroi requested a copy of Dr. Gao's ongoing P30 grant proposal under a promise of confidentiality, and thereafter pressured Dr. Gao to develop a similar proposal, naming Dr. Moroi as Principal Investigator.

53.     On October 17, 2020, Dr. Gao provided Dr. Moroi with a written five-year research plan describing his planned research in biobanking, ophthalmic genetics, AI and

11

imaging applications, and genetic testing using electronic health records. Those same research areas were subsequently pursued by Dr. Moroi's own laboratory while Dr. Gao was systematically denied the resources needed to pursue them.

54. On March 15, 2021, Defendant Dr. Moroi pressured Dr. Gao to write a cornea genetic proposal for which she would be named Principal Investigator. She also pressured Dr. Gao to genotype some cornea genetic samples at Dr. Gao's cost and to provide it to a non-OSU researcher, Dr. Yutao Liu. Later, Dr. Gao learned that the plan was that Dr. Moroi intended to obtain a subcontract PI role from that non-OSU researcher.

55. In June 2021, Defendant Dr. Moroi discouraged Dr. Gao from submitting an R21 AI/glaucoma proposal, stating that the idea would be "given to new recruit" (a non-Chinese faculty member).

56. In June 2021, Defendant Dr. Moroi required Dr. Gao to share his lead-PI R01 proposal for the Mexican American Glaucoma Genetic Study ("MAGGS") with Dr. Moroi's own staff members, who are non-Chinese. In August 2021, Dr. Moroi required Dr. Gao to share the editable MAGGS grant proposal files with Dr. Moroi and with unauthorized collaborators.

57. In or around 2023, research aims directly derived from Dr. Gao's MAGGS grant, including identification of genetic loci, evaluation of pleiotropy and Mendelian randomization, and development of polygenic risk scores, appeared without Dr. Gao's knowledge or consent in Dr. Moroi's IRB protocol titled "Genetic Analysis of Eye Diseases: Ocular Phenotypes, Quantitative Traits, Association Studies, and Polygenic Risk Scores."

58. On July 16, 2024, Defendant Dr. Moroi informed Dr. Gao that she was revising an unsuccessful grant proposal on intraocular pressure variation and genetics and requested his

input for resubmission. Dr. Gao recognized that her proposal substantially overlapped with his own lead-PI proposal submitted in February 2020.

59. On August 14, 2025, Defendant Dr. Moroi invited Dr. Gao to join the resubmission as a Multiple Principal Investigator ("MPI"). On August 18, 2025, Dr. Gao formally accepted and provided substantial scientific contributions, including refinement of specific aims and methodological recommendations.

60. On August 26, 2025, approximately one week after Dr. Gao accepted the MPI role and delivered substantial scientific contributions, Defendant Dr. Moroi informed Dr. Gao that she would proceed without him as an MPI, thereby appropriating Dr. Gao's intellectual contributions while excluding him from credit and leadership.

**October 2024 Meeting and Threatened Immediate Salary Reduction**

61. On October 10, 2024, when Dr. Gao arrived at Dr. Moroi's office for his annual review meeting, her assistant, Audra Erben, stopped Dr. Gao at the door and handed him documents purporting to memorialize the 2021-2022 and 2022-2023 annual reviews and asked him to sign them to retroactively attest that the reviews had occurred. Those reviews had not occurred. Dr. Moroi came out of her office, then greeted Dr. Gao at the door, saying: "I am sorry, I didn't follow through on that. They let me know that I haven't done that in a while." Dr. Gao recorded this exchange.

62. During the October 10, 2024 meeting with Dr. Moroi, joined via Zoom by Dr. Oberyszyn, the Vice Dean for Faculty Affairs, pressured Dr. Gao to accept an immediate salary reduction. Dr. Moroi and Dr. Oberyszyn threatened Dr. Gao with statements including: "The department can reduce your salary without your agreement;" "You must decide today, one of the options is going to happen;" and "Your salary is going to drop by 25%, one way or another."

13

63.     On the afternoon of October 11, 2024, Dr. Gao reported the falsified 2022 and 2023 annual-reviews and the October 10, 2024 salary-reduction threat to Human Resources in the College of Medicine. No corrective action was taken.

64.     On the evening of October 11, 2024, Defendant Dr. Moroi sent Dr. Gao an email asserting that Dr. Gao had received his prior-year annual reviews and continuing to pressure him to sign the falsified 2022 and 2023 annual-review documents.

**Additional Reporting and Continued Retaliation**

65.     On October 14, 2024, Dr. Gao's counsel sent a letter to the University's counsel, Brandon Lester, detailing that Dr. Gao had received significantly less support than was promised in the November 20, 2018 Offer Letter, that Dr. Moroi had siphoned resources from Dr. Gao, failed to sign off on grant applications, restricted access to the promised genetic counselor, and used language from Dr. Gao's grant applications to complete her own applications. No corrective action was taken.

66.     After Dr. Gao retained counsel in October 2024, the Department paused the 25 percent salary reduction that had been threatened at the October 10, 2024 meeting, pending further discussions regarding the terms of Dr. Gao's employment. The threatened reduction was not rescinded, only deferred.

67.     Throughout 2024, Defendant Dr. Moroi told Dr. Gao she had no funds to hire a bioinformatics scientist (Ms. Kelsey Elliott) and then initiated the very same hire herself, eliminating Dr. Gao's opportunity to recruit the qualified candidate he had identified. All interviewing faculty members agreed that Ms. Elliott should be hired into Dr. Gao's lab and his P30 Core B.

14

68. Throughout 2024, Defendant Dr. Moroi misrepresented the availability of Department imaging data (approximately 133,326 Optos images and 4,840 OCT eye images through 2023) for Dr. Gao's AI research, directing Dr. Gao to resources that led to dead ends while her designated contact, Dr. Tim Huerta, confirmed he did not know how to access the imaging data despite 14 documented email communications with his team.

69. On March 11, 2025, Defendant Dr. Moroi continued to pressure Dr. Gao to sign annual review documentation describing matters that had never been discussed, while the actual review meeting focused solely on a salary-reduction MOU.

70. On March 18, 2025, Dr. Gao's attorney sent a further letter to the University's counsel, Mr. Lester, detailing a non-exhaustive list of adverse actions taken against him including obstruction of IRB approvals, misallocation of research funds, intellectual property misuse, criticism and harassment, misleading administrative actions, and non-compliance with startup package commitments. No corrective action was taken.

**OCRC Charge and Subsequent Retaliation**

71. On March 26, 2025, Dr. Gao filed a formal Charge of Discrimination with the Ohio Civil Rights Commission ("OCRC"), alleging discrimination on the basis of race and retaliation. Discrimination based on national origin was added to his charge on June 27, 2025 during his call with the OCRC investigator, Ms. Juanita Perry. The Department and Dr. Moroi, in her capacity as Department Chair, received formal notice of the OCRC Charge. The Charge was dual-filed with the Equal Employment Opportunity Commission ("EEOC").

72. From March 2025 onward, Defendant Dr. Moroi and her staff imposed systematic reimbursement delays requiring Dr. Gao to send multiple reminders to obtain

reimbursement for research-related expenses, increasing his administrative burden and diverting his time from research.

73. On September 30, 2025, Dr. Moroi's assistant requested that Dr. Gao sign a purported 2024-2025 annual review letter dated June 5, 2025, notwithstanding the fact that no annual review meeting had occurred on that date or at any time during that month. This was the fourth review document Dr. Gao had been asked to sign in less than twelve months.

74. From 2022 through 2026, Defendant Dr. Moroi excluded Dr. Gao from Department research visibility platforms, including the Department's glaucoma research website (medicine.osu.edu/departments/ophthalmology/research/glaucoma-research), and Department annual research books for 2022-2024, despite Dr. Gao's extensive and productive glaucoma research record.

75. From 2022 through 2025, Defendant Dr. Moroi initiated independent collaborations with Dr. Gao's existing glaucoma research collaborators, both internal and external to the University, effectively undermining Dr. Gao's established collaborations and professional relationships.

**P30 Core-B Funds and Budget**

76. Dr. Gao serves as Director of Core B of a federally funded NIH P30 Center Grant. Defendant Dr. Moroi is the overall Principal Investigator of the P30 grant, giving her supervisory authority over Core B while simultaneously occupying her role as Department Chair.

77. From 2022 through 2026, Defendant Dr. Moroi diverted Core B materials-and-supplies funds to pay personnel expenses for David Reed, a staff member who on paper was assigned to Core B but who functionally reported to, and worked within the laboratory of, Dr.

Moroi. These reallocations were made without Dr. Gao's knowledge or consent and without notice to him as Core B Director.

78. When Dr. Gao attempted to use Core B funds to hire a replacement staff member to support the Core's scientific mission, he was denied.

79. On January 22, 2026, Dr. Gao formally requested his Core B fiscal-year budget in a Teams meeting with Dr. Moroi and the project manager, Ms. VanArsdale. No budget was provided at the meeting.

80. Defendant Dr. Moroi and the Department withheld Dr. Gao's Core B fiscal-year budget until March 6, 2026 — approximately eight months into the July 1, 2025 to June 30, 2026 fiscal year. The two other P30 Core Directors (Dr. Cebulla and Dr. Doble), neither of whom is of Chinese national origin, received timely budget information at the start of the fiscal year.

81. During the withholding period, Dr. Gao was given inconsistent and contradictory explanations — simultaneously being told that "all core directors had been informed of budgets" and that he "would not directly receive such information." Despite two scheduled meetings and approximately 38 emails, core fiscal questions remained incompletely answered.

82. The Year 5 (July 1, 2026-June 30, 2027) P30 Core B budget was presented to Dr. Gao in near-final form on a tight RPPR timeline in late April 2026, without the kind of advance, substantive consultation with him as Core B Director that he would have expected on material decisions, including the elimination of the Core B materials-and-supplies line. Dr. Gao was not permitted to charge to Core B a computing fee that had been included in his original Core B budget. Other P30 Core Directors, who are not of Chinese national origin, were permitted to charge materials-and-supplies expenses to their respective Cores.

17

**Retaliatory Conduct Following OCRC Determination**

83.     OCRC issued its determination letter on March 12, 2026. One copy was mailed to Dr. Gao's home, which he received on March 13, 2026. A separate copy was mailed to the Department as Respondent on the same date, March 12, 2026.

84.     On March 16, 2026 -- four days after the OCRC determination — a Department administrator circulated an email to all meeting participants characterizing Dr. Gao as not understanding standard grant processes and suggesting he required remedial training on basic NOA/RPPR procedures, despite Dr. Gao's five years of prior experience as a P30 Core Director at another institution. Dr. Gao reasonably understood this email to be intended to serve as documentation that could be used to justify future adverse actions against him.

85.     The Department's copy of the OCRC determination letter (would have arrived at the Department on or about March 13, 2026 — the same date Dr. Gao received his copy) was opened and then left exposed in a shared faculty mailbox area, exposing Dr. Gao's protected activity and identifying information to colleagues. The envelope bore visible markings including the sender "Ohio Civil Rights Commission," the Department addressee, and a handwritten notation "Research Gao Ophthal" that expressly identified Dr. Gao by name as the subject of the OCRC correspondence.

86.     On April 13, 2026, a Department Administrative Assistant discovered the opened OCRC determination letter exposed in the shared faculty mailbox area, photographed and scanned it, and emailed the image to Dr. Gao. Any faculty member, staff member, or visitor accessing the shared mailbox area during the preceding approximately thirty-day period could have seen that Dr. Gao was the subject of an active OCRC matter against his own Department.

18

87. On April 10, 2026, approximately four weeks after the OCRC determination was issued, the Department announced a policy requiring research faculty to cover 50 percent of their salaries through external research funding, beginning in the fiscal year starting July 2026. Under the announced policy, research faculty who fail to meet the 50 percent external-funding threshold in the first fiscal year of implementation faced a 25 percent salary reduction, and those who fail to meet it in a second consecutive fiscal year faced a 50 percent salary reduction. Dr. Gao is under imminent threat of these reductions. The policy effectively revives the 25 percent reduction that had been threatened at the October 10, 2024 meeting and paused following the engagement of Dr. Gao's counsel, and, in its second-year tier, escalates that threatened reduction to 50 percent.

88. On April 14, 2026, Dr. Gao filed a second charge of discrimination with the EEOC claiming national origin discrimination and retaliation for pursuing his first charge of discrimination. The second charge was assigned Charge No. 532-2026-02987.

89. In April 2026, the Department directed Dr. Gao to move laboratory equipment from the Wiseman facility to the Pelotonia Research Center and required Dr. Gao to pay the moving fee from his startup package. Similarly situated, non-Chinese faculty members of the same rank, including Drs. Shigeo Tamiya and Nagaraj Kerur, had their equivalent moving fees paid by the Department rather than charged to the faculty member's startup or research funds.

90. The 50 percent external-funding policy operates on research conditions that have been materially degraded by the prior conduct alleged herein, including the 2023 MOU's contraction of Dr. Gao's startup resources, the diversion of Core B funds, the obstruction of IRB protocols, the denial of genetic counselor and research staff support, the appropriation of grant content, and the withholding of genetic and imaging data access. As a result, application of the policy to Dr. Gao would impose

19

financial penalties tied to a funding gap that the prior denial of his promised resources directly contributed to creating.

91.     On June 15, 2026, at the request of Dr. Gao, the EEOC provided Dr. Gao a Notice of Right to Sue.

**FIRST CLAIM FOR RELIEF – DEFENDANT THE OHIO STATE UNIVERSITY
DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 2000e-2(a)(1)**

92.     Plaintiff restates and realleges each and every allegation contained in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

93.     42 U.S.C. §2000e-2(a)(1) makes it unlawful for an employer to discriminate against an employee on the basis of the employee's race or national origin with respect to his compensation, terms, conditions, or privileges of employment.

94.     Defendant The Ohio State University is an employer within the meaning of 42 U.S.C. § 2000e(b).

95.     At all times relevant herein, Plaintiff Dr. Gao was an employee of Defendant within the meaning of 42 U.S.C. § 2000e(f).

96.     Pursuant to 42 U.S.C. §2000e-2(a)(1), Plaintiff Dr. Gao is entitled to protection from discrimination because of and/or on the basis of his race, Asian, and his national origin, Chinese.

97.     At all relevant times herein, Plaintiff Dr. Gao was qualified for his position.

98.     Throughout the course of his employment with Defendant The Ohio State University, Plaintiff Dr. Gao was subjected to an ongoing, continuous series of discriminatory acts because of and/or on the basis of his race and national origin.

99.     At all relevant times, similarly situated, non-Chinese faculty in the Department including, but not limited to, Drs. Nagaraj Kerur and Shigeo Tamiya, received superior office

assignments, adequate laboratory space, timely and complete annual performance reviews, regular merit salary increases, timely Letters of Support for grant submissions, timely Core fiscal-year budget information, full access to departmentally promised resources, inclusion in Department research visibility platforms and collaborations, and collaborative rather than obstructive relationships with Dr. Moroi.

100.    Dr. Gao, an Asian faculty member of Chinese-national-origin, received inferior office space near restrooms, inadequate laboratory space, no timely annual reviews for multiple years, only one merit increase in six years of employment, delayed or withheld grant support, eight-month withholding of Core B budget information, unilateral and covert contraction of his startup resources, exclusion from Department visibility and collaboration platforms, and obstructive conduct from Dr. Moroi.

101.    The discriminatory conduct on the part of Dr. Moroi interfered with the terms and conditions of Dr. Gao's employment and subjected him to adverse employment actions.

102.    As a direct and proximate result of the Department's discriminatory conduct, Dr. Gao has suffered, and continues to suffer, substantial harm, including but not limited to: lost merit salary increases; an imminent tiered salary reduction of 25 percent in the first year of non-compliance with the April 10, 2026 policy and 50 percent in a second consecutive year of non-compliance; loss of research opportunities and materials (including the expiration of 86 percent of purchased DNA collection kits); loss of promised startup personnel and resources; loss of lead-PI grant leadership opportunities; diversion of his intellectual work to others without attribution; denial of professional development opportunities; loss of research autonomy; blocked career advancement; impaired research productivity; damaged professional reputation; and exclusion from Department research visibility.

103.     Dr. Gao has also suffered significant emotional distress, stress-related health impacts, professional isolation, retaliation, and the daily burden of performing his work under a hostile environment where he has been the repeated target of adverse action by the Chair of his Department on the basis of his race and national origin.

## SECOND CLAIM FOR RELIEF – DEFENDANT THE OHIO STATE UNIVERSITY RETALIATION IN VIOLATION OF 42 U.S.C. § 2000e-3

104.     Plaintiff restates and realleges each and every allegation contained in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

105.     42 U.S.C. §2000e-3(a) makes it unlawful for any employer to discriminate against any individual or employee because that individual or employee has opposed any practice made unlawful by Title VII of the Civil Rights Act of 1964.

106.     In the manner described above, Defendant The Ohio State University, through its employees and/or agents, engaged in a pattern and practice of race and national origin discrimination against Plaintiff Dr. Gao.

107.     Plaintiff Dr. Gao engaged in protected activity by reporting Dr. Moroi's animus against him and the discrimination he was experiencing at the University based on his race and national origin to Defendant and subsequently filing a charge of discrimination with the OCRC on March 26, 2025, which was dual-filed with the EEOC.

108.     Plaintiff Dr. Gao had a reasonable belief that Defendant engaged in discriminatory practices and had a good faith basis for filing his charges of discrimination.

109.     Defendant had knowledge of Plaintiff's protected activity.

110.     Plaintiff Dr. Gao engaged in additional protected activity by filing a second charge of discrimination with the EEOC claiming national origin discrimination and retaliation for pursuing his first charge of discrimination on April 14, 2026.

22

111. In response to Plaintiff Dr. Gao's protected activity, Defendant The Ohio State University retaliated against Plaintiff and subjected him to several adverse employment actions including, but not limited to, threatening a 25% salary reduction, falsifying his annual reviews for 2024-2025, withholding his Core B fiscal budget for 8 months, and providing him with a fictitious meeting review letter on June 5, 2025.

112. After Plaintiff Dr. Gao filed his second charge of discrimination and retaliation, Defendant The Ohio State University escalated its retaliation against Dr. Gao when in April 2026, the Department directed Dr. Gao to move laboratory equipment from the Wiseman facility to the Pelotonia Research Center and required Dr. Gao to pay the moving fee from his startup package. Similarly situated, non-Chinese faculty members of the same rank, who had not engaged in protected activity, including Drs. Shigeo Tamiya and Nagaraj Kerur, had their equivalent moving fees paid by the Department rather than charged to the faculty member's startup or research funds.

113. By adopting a 50 percent external-funding policy after Plaintiff Dr. Gao engaged in protected activity, Defendant The Ohio State University engaged in further retaliatory conduct toward Plaintiff Dr. Gao, knowing that he had been forced to operate under research conditions that have been materially degraded by the prior conduct alleged herein, including the 2023 MOU's contraction of Dr. Gao's startup resources, the diversion of Core B funds, the obstruction of IRB protocols, the denial of genetic counselor and research staff support, the appropriation of grant content, and the withholding of genetic and imaging data access. As a result, application of the policy to Dr. Gao would impose financial penalties tied to a funding gap that the prior denial of his promised resources directly contributed to creating.

114. The conduct of Defendant The Ohio State University toward Plaintiff Dr. Gao would have dissuaded a reasonable employee from making and/or supporting future complaints of unlawful discriminatory practices against it.

115. Defendant The Ohio State University cannot proffer a legitimate, nondiscriminatory justification for subjecting Plaintiff Dr. Gao to these adverse employment actions and retaliation.

116. Defendant The Ohio State University, through its employees and/or agents, violated 42 U.S.C. §2000e-3(a), which prohibits retaliation against employees for complaining about unlawful discriminatory practices, by retaliating against Plaintiff Dr. Gao for having reported and opposed Defendant's violations of Title VII of the Civil Rights Act of 1964.

117. As a direct and proximate result the retaliatory actions of Defendant The Ohio State University, Dr. Gao has suffered, and continues to suffer, substantial harm, including but not limited to: lost merit salary increases; an imminent tiered salary reduction of 25 percent in the first year of non-compliance with the April 10, 2026 policy and 50 percent in a second consecutive year of non-compliance; loss of research opportunities and materials (including the expiration of 86 percent of purchased DNA collection kits); loss of promised startup personnel and resources; loss of lead-PI grant leadership opportunities; diversion of his intellectual work to others without attribution; denial of professional development opportunities; loss of research autonomy; blocked career advancement; impaired research productivity; damaged professional reputation; and exclusion from Department research visibility.

118. As a direct and proximate result of the retaliatory actions of Defendant The Ohio State University, Dr. Gao has also suffered significant emotional distress, stress-related health impacts, professional isolation, and the daily burden of performing his work under a hostile

24

environment where he has been the repeated target of adverse action by the Chair of his Department for engaging in protected activity.

119. Each and every retaliatory action by Defendant The Ohio State University complained of herein was intentional, motivated by malice and ill will, and/or done with reckless disregard for Plaintiff Dr. Gao's protected rights.

**THIRD CLAIM FOR RELIEF – DEFENDANT THE OHIO STATE UNIVERSITY HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 2000e-2(a)(1)**

120. Plaintiff restates and realleges each and every allegation contained in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

121. 42 U.S.C. § 2000e-2(a)(1) makes it unlawful for an employer to discriminate against an employee with respect to the terms, conditions, or privileges of employment by creating and maintaining a hostile work environment based on the employee's protected characteristics.

122. Plaintiff Dr. Gao is a member of two protected classes — race (Asian) and national origin (Chinese).

123. Throughout the course of his employment with Defendant The Ohio State University, Plaintiff Dr. Gao was subjected to unwelcome harassment, including but not limited to:

(a) Dr. Moroi's repeated criticism of Dr. Gao's English-language proficiency, particularly in contexts in which Dr. Moroi was denying him access to personnel and resources promised in his Offer Letter;

(b) Dr. Moroi's repeated criticism of Dr. Gao for expressing professional scientific opinions in circumstances in which Dr. Moroi did not similarly criticize non-Chinese faculty;

(c)     Dr. Moroi's public "junior" labeling of Dr. Gao on January 20, 2022 in contrast to her "senior" labeling of Egyptian-American Dr. Mohamed Abdel-Rahman, an associate professor of identical rank;

(d)     Dr. Moroi's repeated dismissive comments such as "Raymond, you are still young";

(e)     Dr. Wold's September 6, 2022 statement, "We are all adults. Don't be childish," made at a College-of-Medicine-level meeting that had been called in response to Dr. Gao's discrimination complaints;

(f)     the falsified annual review documents and the October 10, 2024 threats described above; and

(g)     the continuing pattern of resource denial, professional marginalization, and exclusion from Department visibility and collaboration platforms documented in the preceding paragraphs.

124.    The harassment described above was based on Plaintiff's race and national origin, as evidenced by, *inter alia*, Dr. Moroi's explicit references to Dr. Gao's English-language proficiency; her public "junior" labeling of Dr. Gao in direct contrast to her "senior" labeling of an Egyptian-American faculty member of identical rank; and the materially better treatment of similarly situated, non-Chinese faculty (including Drs. Nagaraj Kerur, Shigeo Tamiya, Thomas Mendel, and Mohamed Abdel-Rahman) with respect to office space, laboratory space, personnel support, grant resources, performance reviews, compensation, and professional visibility.

125.    The harassment described above was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. The harassment persisted continuously from 2022 through 2026 and affected every material term

26

and condition of Dr. Gao's employment, including his compensation, his physical workplace, his personnel support, his grant resources, his performance reviews, his professional visibility, and his ability to conduct his research.

126. Plaintiff Dr. Gao subjectively perceived the workplace as hostile and abusive, as evidenced by his contemporaneous reports to Ms. Sophia Antoun, Dr. Gloria Fleming, Dr. Dana McTigue, Dr. Loren Wold, and others, and by his contemporaneous statement that the negative comments and unfortunate issues had "silenced" him.

127. The harassment described above would be objectively perceived as creating a hostile and abusive working environment by a reasonable person in Plaintiff's circumstances.

128. Because Dr. Moroi was Plaintiff's supervisor at all relevant times, and because Dr. Moroi's harassment culminated in tangible employment actions — including but not limited to the unilateral execution of the 2023 MOU, the October 10, 2024 threatened salary reduction, the August 26, 2025 Multi-Principal-Investigator removal, the eight-month withholding of Core B fiscal-year budget information, the elimination of the Core B materials-and-supplies line, and the April 10, 2026 tiered salary-reduction policy — Defendant The Ohio State University is vicariously liable for Dr. Moroi's harassment.

129. The hostile work environment created by Defendant The Ohio State University, by and through Dr. Moroi, constitutes a continuing violation. The entire time period of the hostile work environment may be considered for purposes of liability because at least one component act contributing to the hostile work environment occurred within the limitations period, including but not limited to: (i) the October 10, 2024 threatened salary reduction; (ii) the September 30, 2025 purported annual review letter dated June 5, 2025 referencing a meeting that never occurred; (iii) the eight-month withholding of Core B fiscal-year budget information

27

from approximately July 2025 through March 6, 2026; (iv) the April 10, 2026 tiered salary-reduction policy; (v) the April 2026 lab-equipment moving-fee disparity; and (vi) the May 12, 2026 P30 RPPR documenting the elimination of Plaintiff's Core B materials-and-supplies funding.

130. Defendant The Ohio State University cannot proffer a legitimate, nondiscriminatory justification for maintaining the hostile work environment described herein, and any justification offered would be pretextual.

131. As a direct and proximate result of Defendant's maintenance of the hostile work environment described herein, Dr. Gao has suffered, and continues to suffer, substantial harm, including but not limited to: lost merit salary increases; an imminent tiered salary reduction of 25 percent in the first year of non-compliance with the April 10, 2026 policy and 50 percent in a second consecutive year of non-compliance; loss of research opportunities and materials; loss of promised startup personnel and resources; loss of lead-PI grant leadership opportunities; diversion of his intellectual work to others without attribution; denial of professional development opportunities; loss of research autonomy; blocked career advancement; impaired research productivity; damaged professional reputation; and exclusion from Department research visibility.

132. As a direct and proximate result of Defendant's maintenance of the hostile work environment described herein, Dr. Gao has also suffered significant emotional distress, stress-related health impacts, professional isolation, and the daily burden of performing his work in a hostile environment where he has been the repeated target of adverse action by the Chair of his Department based on his race and national origin.

28

133. Each and every act of harassment by Dr. Moroi on behalf of Defendant The Ohio State University complained of herein was intentional, motivated by malice and ill will, and/or done with reckless disregard for Plaintiff Dr. Gao's protected rights.

**FOURTH CLAIM FOR RELIEF – DEFENDANT SAYOKO MOROI, M.D., Ph.D. VIOLATION OF THE EQUAL PROTECTON CLAUSE OF THE 14TH AMENDMENT**

134. Plaintiff restates and realleges each and every allegation contained in the preceding paragraphs of this Verified Complaint as if fully rewritten herein.

135. 42 U.S.C. § 1983 imposes liability upon a person who, under color of law, subjects a person to a deprivation of the rights afforded to them under the United States Constitution.

136. At all times relevant hereto, Defendant Dr. Moroi was acting under color of law as the Chair of the Department of Ophthalmology and Visual Sciences for Defendant The Ohio State University.

137. Defendant Dr. Moroi engaged in the acts previously set forth in this Verified Complaint and was personally involved in all of the conduct that forms the basis of Plaintiff's Verified Complaint.

138. By intentionally engaging in each of the discriminatory and retaliatory acts directed toward Plaintiff Dr. Gao because of his membership in a protected class that are set forth herein, Defendant Dr. Moroi violated clearly established law which protects Plaintiff from discrimination and retaliation in employment and violated his rights under the Equal Protection Clause of the Fourteenth Amendment.

139. By discriminating against Plaintiff in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and retaliating against him for

29

raising concerns about discrimination, Defendant Dr. Moroi, in her individual capacity, violated the Fourteenth Amendment, which is actionable under 42 U.S.C. § 1983.

140. As a direct and proximate result of Defendant Dr. Moroi's violation of his right to Equal Protection under the Fourteenth Amendment, Plaintiff Dr. Gao has suffered damages as previously stated herein.

WHEREFORE, Plaintiff demands judgment against Defendants on all his foregoing claims as follows:

1. Compensatory damages against each Defendant in an amount in excess of seventy-five thousand dollars and 00/100 cents ($75,000.00);

2. A permanent injunction enjoining Defendant The Ohio State University, its officers, agents, employees, successors, and assigns from engaging in any further acts of discrimination and retaliation against Plaintiff;

3. Back pay (including lost merit salary increases, and lost promotion-related compensation), with prejudgment interest, in an amount to be determined at trial;

4. Front pay in an amount to be determined at trial, in lieu of reinstatement to the terms and conditions of employment to which Plaintiff is lawfully entitled, to the extent equitable remedies are inadequate;

5. Compensatory damages against each Defendant for emotional distress, mental anguish, humiliation, loss of enjoyment of life, damage to professional reputation, and interference with career advancement, in an amount to be determined at trial;

6. An order requiring Defendant The Ohio State University to implement and comply with effective anti-discrimination and anti-retaliation policies, training, and oversight within the Department of Ophthalmology and Visual Sciences;

7.  Actual costs, reasonable attorney fees, and expenses of this action; and

8.  Such other and further relief as may be deemed appropriate by the Court.

Respectfully submitted,

Judith E. Galeano (0048366) Trial Attorney
Barbara K. Letcher (0046948) (Of Counsel)
Gregory T. Shumaker (0095552)
Mowery Youell & Galeano, Ltd.
485 Metro Place South, Suite 220
Dublin, Ohio 43017
Phone: (614) 764-1444
Fax: (614) 760-8654
Email: jgaleano@myglaw.com
Email: bletcher@myglaw.com
Email: gshumaker@myglaw.com
*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a jury trial for all issues contained in this Complaint.

Judith E. Galeano (0048366) Trial Attorney
Barbara K. Letcher (0046948) (Of Counsel)
Gregory T. Shumaker (0095552)
Mowery Youell & Galeano, Ltd.
485 Metro Place South, Suite 220
Dublin, Ohio 43017
Phone: (614) 764-1444
Fax: (614) 760-8654
Email: jgaleano@myglaw.com
Email: bletcher@myglaw.com
Email: gshumaker@myglaw.com
*Counsel for Plaintiff*

## VERIFICATION

**STATE OF OHIO**          )
                                     )    **ss:**

**COUNTY OF FRANKLIN**     )

Now comes the affiant, first being duly sworn and cautioned, and hereby states that he has read the foregoing complaint and that the averments contained therein are true and accurate to the best of his knowledge.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Xiaoyi Raymond Gao, Ph.D.

Sworn to me and subscribed in my presence this _26_ day of June, 2026.

_____
Notary Public

**ELIZABETH J. BIRCH**
Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration
Section 147.03 R.C.

32